**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **BESTWAY OILFIELD, INC.** | § | |
| | § | |
| *Plaintiff,* | § | **Civil Action No. 4:24-cv-02996** |
| | § | |
| **v.** | § | |
| | § | |
| **MICHAEL MAPES, ORLIN** | § | |
| **MATUTE MURILLO, and** | § | |
| **SERVICEPLUS, LLC,** | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff Bestway Oilfield, Inc. ("Bestway") and files this First Amended Complaint (the "Complaint") against Defendants Michael Mapes ("Mapes"), Orlin Matute Murillo ("Murillo"), and ServicePlus, LLC ("ServicePlus"), and in support thereof would respectfully show the Court the following:

## I.      NATURE OF THE CASE

1.      ServicePlus—a business started by a former Bestway employee—has brazenly recruited away *two more* Bestway employees, encouraging them to pilfer Bestway's trade secrets, so they can replicate Bestway's proprietary frac valve

technology, steal customers, and get a free ride on Bestway's back. The two departing Bestway employees, Mapes and Murillo, admit as much, and evidence shows they have done exactly that. As such, Bestway seeks to enforce its rights and protect its confidential information and proprietary trade secrets, including those related to its proprietary frac valve technology and confidential customer and vendor information.

2.　　　Bestway further seeks to enforce the reasonable terms of its noncompetition agreement with Defendant Mapes, whose recent conduct constitutes a blatant violation of the agreement. As one of Bestway's six Branch Managers, Defendant Mapes held a high-level position and was entrusted with access to all of Bestway's proprietary information, including its national customer base, vendors, pricing information, and technical specifications. As such, the terms of his non-compete are reasonable and must be enforced.

## II.　　PARTIES

3.　　　Plaintiff Bestway Oilfield, Inc. is a Texas corporation with its principal place of business at 16030 Market St. Channelview, Texas 77530. Bestway may be served through undersigned counsel.

4.　　　Defendant Michael Mapes is an individual who is a resident of the state of Pennsylvania. He may be served with process at 132 Edgewood Dr., Beaver, Pennsylvania 15009, or wherever he may be found.

5.     Defendant Orlin Matute Murillo is an individual who is a resident of the state of Texas. He may be served with process at 10706 Cora St #124, Houston TX 77088.

6.     Defendant ServicePlus LLC is a Texas limited liability company with its principal place of business at 3416 Pinemont Dr., Houston, Texas 77018.

## III.   JURISDICTION AND VENUE

7.     The Court has subject matter jurisdiction over the lawsuit pursuant to 28 U.S.C. § 1331 because Bestway asserts a claim against all Defendants that arises under the law of the United States, namely, the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*

8.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's other claims because Plaintiff's claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the U.S. Constitution and derive from a common nucleus of operative fact.

## IV.   FACTUAL BACKGROUND

**A.     Bestway is a Successful Supplier and Servicer of Specialized Oilfield Equipment and Takes Strict Measures to Protect its Confidential and Proprietary Information.**

9.     Bestway is a family-owned and operated oilfield services company that sells, rents, repairs, and services specialized oilfield equipment, including valves to

its customers nation-wide and internationally. Bestway offers its customers multiple options for acquiring equipment, such as rent, purchase, or lease-to-own. Bestway also provides various services to its customers, including repair of oilfield equipment.

10.     Since inception, Bestway has expended significant time, effort, and millions of dollars developing its vendor and customer relationships, proprietary, confidential, and trade secret information, goodwill, and other legitimate business interests. Therefore, it is imperative to Bestway's success as a business that its proprietary, confidential, and trade secret information not be improperly disclosed or used to benefit a competitor. To that end, Bestway takes strict, proactive measures to protect this information by requiring its employees to sign agreements restricting the use and disclosure of this confidential information.  These measures are described in further detail below. Bestway also protects its confidential information by ensuring its ERP system, an electronic database containing extensive customer, sales, purchase, and vendor information, is password-protected and only available to certain employees who are given their own personal passwords for access. Additionally, Bestway maintains drives with limited access to specific individuals and departments.

**B.     Bestway Has Invested Millions of Dollars and Significant Man Hours to Develop a Valuable, Proprietary Valve Technology.**

11.     Over the past 18 months, Bestway has spent millions of dollars diligently developing and continuing to develop its frac valve technology. Bestway's

new patent-pending[1] frac valve features a dual purpose ValveShield System technology, which enables greaseless and serviceless frac operations while simultaneously eliminating sand and particle intrusion. The innovative design significantly decreases costs of repairs, eliminates nonproduction time, and extends the service life of the valve, saving customers both time and money. This technology is revolutionary and has the potential to change the industry. The valve eliminates the need for extra service technicians and ancillary equipment on well-site locations, reducing costs and increasing safety.

12.    This proprietary valve technology gives Bestway a significant competitive advantage over its competitors. Bestway's technology is referred to herein as "Proprietary Valve Technology," and Bestway considers the valve's know-how and technical specifications the company's proprietary trade secret information.

### C.    Mapes' and Murillo's Employment with Bestway: Both Departing Employees Held Positions of Trust and Received Confidential Information to Fulfill Their Duties at Bestway.

13.    Both Mapes and Murillo have been valuable employees of Bestway's since 2015, and both men have a history of working together, including on Bestway's Proprietary Valve Technology.

14.    In or around April 2015, Bestway first hired Michael Mapes as a Production Manager at its Channelview, Texas location. Five years later, on or

---

[1] U.S. Patent Application No. 18/416,795 for Dynamic Slab Gate Valves [Skirts].

around May 12, 2020, Bestway promoted Michael Mapes to Branch Manager. Mapes moved to Pennsylvania for this promotion. In his capacity as Branch Manager, Mapes had intimate knowledge regarding all facets of Bestway's operations, and his position required that he have access to the Proprietary Valve Technology dimension details. Indeed, Mapes was one of a select group of employees who had access to a "Technical Drawings Drive" for the Proprietary Valve Technology; and that Drive contains all product drawings, including critical dimensions and components, manufacturing details and material specifications.

15.    Mapes also had a special level of access to Basis, Bestway's password-protected ERP (enterprise resource planning) system. Via Basis, Mapes had access to Bestway's sales order information, including but not limited to a history of sales records to Bestway's customers, purchase orders, account numbers, customer names and contact information, part numbers and descriptions of orders, order status and pricing, and purchase order information, including a history of purchase orders, order and shipment dates, vendor names, vendor contact information, part numbers and descriptions, and pricing details. As a Branch manager, Mapes also participated in Bestway's weekly branch manager meetings, during which the company's largest customers and their business needs were discussed.

16.    On or around March 2, 2015, Bestway first hired Murillo as a Valve Technician. As a Valve Technician at Bestway, Murillo worked directly on

Bestway's Proprietary Valve Technology under Mapes's management at Bestway's Channelview, Texas location. Thereafter, Murillo was promoted to Valve Technician Instructor. In this position, Murillo traveled to Pennsylvania numerous times and worked again with Mapes on the Proprietary Valve Technology. Murillo also traveled to other Bestway locations to train other valve technicians on the proper Bestway procedures for teardown, repair, and assembly for both existing Bestway valves and the Proprietary Valve Technology (Service-Less™ valves). Murillo was instrumental in troubleshooting the Proprietary Valve Technology with Bestway's engineering department. By working directly on the Proprietary Valve Technology, both Murillo and Mapes can also identify the parts used for the Proprietary Valve Technology and how the Proprietary Valve Technology works.

**D.    Mapes and Murillo Agreed to Safeguard Bestway's Confidential Information and Protected Trade Secrets.**

17.    As a condition of their employment with Bestway, like all employees, Mapes and Murillo received an employee handbook from Bestway (the "Employee Handbook"). Both Mapes and Murillo signed an Acknowledgement of Receipt of Employee Handbook which states: "I agree to and will comply with the policies, procedures, and other guidelines set forth in the handbook."

18.    The Employee Handbook includes a provision entitled "Non-Disclosure/Confidentiality." This provision specifically requires employees to not disclose to any third party any of Bestway's confidential and proprietary information,

including matters of a technical nature such as product research and designs, and matters of a business nature such as pending projects, customer lists, pricing lists, procedures, analyses, training programs, and other proprietary information.

### E. Mapes Also Specifically Agreed Not to Compete with Bestway or Solicit Its Customers and Vendors.

19. Additionally, in conjunction with his promotion to Branch Manager and due to the heightened level of responsibilities and trust and confidence placed in him, including access to customers and vendors, pricing information, and the technical specifications pertaining to Bestway's Proprietary Valve Technology, Mapes entered into an At-Will Employment Agreement with Bestway effective May 12, 2020 (the "Employment Agreement").

20. The Employment Agreement expressly states that, as Branch Manager, Mapes will be provided with certain consideration, including being entrusted with and provided access to Bestway's Confidential Information, business opportunities, customers and donors, information regarding other employees' salaries and pay scales, vendors, additional compensation and other benefits. Employment Agreement, Article IV(B).[2]

---

[2] "Confidential Information" is defined to include all trade secrets and confidential and proprietary information of Bestway, including "all documents or information, in whatever form or medium, concerning or relating to any of [Bestway's] operations;" "processes"; "products"; "customer lists"; "customer contact information"; "vendor lists"; "policies"; "strategies"; "training manuals"; "research"; "development"; "know-how"; "technical data"; "designs"; "drawings"; "illustrations"; "models";

21.   For this reason, the Employment Agreement contains a series of restrictive covenants prohibiting Mapes from, among other things, using or disclosing Bestway's confidential information, becoming employed by any "Competing Business," and using confidential information to attempt to solicit business with or interfere with any business or contracts with Bestway. The following excerpts are taken from Mapes' Employment Agreement:

> (i)    **No Unauthorized Use or Disclosure**. Employee agrees to preserve and protect the confidentiality of all Confidential Information. Employee agrees that during the period of Employee's employment with the Company and at any time thereafter (regardless of the reason for Employee's separation or termination of employment): (a) Employee shall hold all Confidential Information in the strictest confidence, take all reasonable precautions and steps to safeguard all Confidential Information and prevent its wrongful use by or wrongful or inadvertent disclosure or dissemination to any unauthorized person or entity, and follow all policies and procedures of the Company protecting or regarding the Confidential Information; and (b) without prior written authorization of the CEO of the Company, Employee shall not, directly or indirectly, use for Employee's own account, use for any other purpose, disclose to anyone, publish, exploit, destroy, copy or remove from the offices of the Company, nor solicit, allow or assist another person
>
> **BRANCH MANAGER EMPLOYMENT AGREEMENT**            Page 5
>                                              Initials

Employment Agreement, Article IV(A)(i).

---

"prototypes"; "developmental or experimental work"; "plans for research or future products"; "projects or services"; "management methods and information"; and "reports, recommendations and conclusions" (collectively, "Confidential Information"). *Id*. Article IV(A)(i).

(i) **Non-Competition**. Employee agrees that during the Restricted Period (defined below), other than in connection with Employee's duties under this Agreement, Employee shall not, without the prior written consent of the Company, directly or indirectly, either individually or as a principal, partner, stockholder, manager, agent, consultant, contractor, distributor, employee, lender, investor, or as a director or officer of any corporation or association, or in any other manner or capacity whatsoever, (a) control, manage, operate, establish, take steps to establish, lend money to, invest in, solicit investors for, or otherwise provide capital to, or (b) become employed by, join, perform services for, consult for, do business with or otherwise engage in any Competing Business (defined below) within the Restricted Area (defined below). Employee shall not receive any additional compensation for the enforceability of the Restrictive Covenants in this Article IV.

For purposes of this Agreement:

(a) *"Restricted Period"* means during Employee's employment with the Company and for a period of twenty-four (24) months immediately following the date of Employee's termination from employment for any reason or if Employee leaves Company for any reason.

(b) As Branch Manager, Employee has overall responsibility for the Company's business in the United States of America, and has access to the Company's Confidential Information. Therefore, the *"Restricted Area"* means within 250 miles of any geographic area in which Company operates or sells to or will operate or sell to in the future, including, its locations in Channelview, Texas, Alice, Texas, Tyler, Texas, Odessa, Texas, and Burgettstown, Pennsylvania, or seriously considered opening a location, during Employee's employment and for which Employee had any responsibility or about which Employee received Confidential Information.

(c) *"Competing Business"* means any business, individual, partnership, firm, corporation or other entity that is engaged in the sale, service, rental or repairs of oilfield equipment and any other business the Company conducted and for which Employee had any responsibility or took steps to conduct during Employee's employment with the Company and about which Employee received Confidential Information.

Employment Agreement, Article IV(B)(i).

> (ii)    **Non-Solicitation**. Employee agrees that during the Restricted Period, other than in connection with Employee's duties under this Agreement, Employee shall not use any Confidential Information to, directly or indirectly, either as a principal, manager, agent, employee, consultant, officer, director, stockholder, partner, investor or lender or in any other capacity, and whether personally or through other persons, solicit business from, interfere with, or induce to curtail or cancel any business or contracts with the Company, or attempt to solicit business with, interfere with, or induce to curtail or cancel any business or contracts with the Company, or do business with any actual or prospective customer, service provider, supplier or vendor of the
>
> **BRANCH MANAGER EMPLOYMENT AGREEMENT**   Page 7
>
> Initials
>
> Company with whom the Company did business or who the Company solicited within the preceding two (2) years, and who or which: (1) Employee contacted, called on, serviced or did business with during Employee's employment with the Company; (2) Employee learned of as a result of Employee's employment with the Company; or (3) about whom Employee received Confidential Information. This restriction applies only to business which is in the scope of services or products provided by the Company.

Employment Agreement, Article IV(B)(ii).

22.    Mapes also expressly agreed these restrictive covenants are reasonable:

> E.    **Reasonableness**. Employee hereby represents to the Company that Employee has read and understands, and agrees to be bound by, the terms of this Article IV. Employee understands that covenants in Article IV may limit Employee's ability to engage in certain businesses anywhere in or involving the Restricted Area during the Restricted Period, but Employee acknowledges that Employee shall receive Confidential Information, as well as sufficiently high remuneration and other benefits as an employee of the Company to justify such restrictions. Employee acknowledges that the geographic scope and duration of the covenants contained in this Article IV are fair and reasonable in light of (i) the nature and wide geographic scope of the operations of the Company's business; (ii) Employee's level of control over and contact with the business in the Restricted Area; and (iii) the amount of compensation and Confidential Information (including, without limitation, trade secrets) that Employee is receiving in connection with Employee's employment by the Company. It is the desire and intent of the Parties that the provisions of Article IV be enforced to the fullest extent permitted under applicable law, whether now or hereafter in effect and therefore, to the extent permitted by applicable law, Employee and the Company hereby waive any provision of applicable law that would render any provision of Article IV invalid or unenforceable.

23.　　And Mapes further acknowledged that any violation of the above-identified covenants would result in irreparable injury to Bestway, in which case injunctive relief would be justified:

> D.　　**Remedies**. Employee acknowledges that the covenants and restrictions contained in Article IV of this Agreement, in view of the nature of the Company's business and Employee's position with the Company, are reasonable and necessary to protect the Company's legitimate business interests and that any violation of Article IV of this Agreement would result in irreparable injury to the Company.  In the event of a breach by Employee of Article IV of this Agreement, Employee immediately forfeits any unpaid portion of the Base Salary  or Bonus from the date of such breach and the Company shall be entitled to (i) cease payment of any unpaid portion of the Base Salary; and (ii) recover any portion of the Base Salary or Bonus paid to Employee from the date of such breach or threatened breach.  In addition, the Company shall be entitled to a temporary
>
> **BRANCH MANAGER EMPLOYMENT AGREEMENT**  Page 8
> Initials
>
> restraining order and injunctive relief restraining Employee from the commission of any breach, in addition to damages, attorneys' fees and costs.  If a bond is required to secure such equitable relief, the Parties agree that a bond not to exceed $1,000 shall be sufficient and adequate in all respects to protect the rights and interests of the Parties.  Such remedies shall not be deemed the exclusive remedies for a breach or threatened breach of this Article IV but shall be in addition to all remedies available at law or in equity, including the forfeiture of any bonus of other amounts owing to Employee and the recovery of damages and attorneys' fees from Employee, Employee's agents, any future employer of Employee, and any person that conspires or aids and abets Employee in a breach or threatened breach of this Agreement.

Employment Agreement, Article IV(D).

**F.    In June 2024, Mapes and Murillo Resign to Work for Bestway's Competitor, ServicePlus and Brazenly Threaten to Share Confidential and Protected Trade Secret Information with Their New Employer.**

24.    ServicePlus is Bestway's direct competitor.[3] On its website, ServicePlus describes itself as a "frac equipment solutions partner" and "a valve component and surface equipment manufacturer."[4] "We stock everything that you need to keep your equipment operating in the field." *Id.*

25.    Beginning in the Spring of 2024, ServicePlus and its owner, Jacob Cox, who himself is convicted felon and a former employee of Bestway's, deliberately engaged in a calculated campaign to recruit some of Bestway's key employees who have knowledge and experience with Bestway' Proprietary Valve Technology and other protected trade secret information away from Bestway and to work at Service Plus.

---

[3] Indeed, Bestway has another lawsuit pending against ServicePlus and Jacob R. Cox, its owner. *See Bestway Oilfield, Inc. v. Jacob R. Cox and ServicePlus, LLC*, Cause No. 2020-32320, in the District Court of Harris County, Texas, 270th Judicial District. The factual bases supporting Bestway's claims for breach of contract, breach of fiduciary duty, tortious interference, unfair competition, and misappropriation of trade secrets/confidential information, are that Cox was also a former Bestway employee who signed an agreement similar to the Employment Agreement here, but in the midst of his employment, he formed ServicePlus, was competing with Bestway, soliciting business from Bestway's customers, and using Bestway's confidentiality and proprietary information to business ServicePlus' business.

[4] https://serviceplusoilfield.com/about-us/, last visited August 8, 2024.

26.     On June 13, 2024, Murillo left work early and informed his supervisor that he was on paid-time off. Bestway's human resources reached out to Murillo on numerous occasions to inquire when he would return to work, but they never received a response. Murillo never returned, and his employment was thereafter terminated. Upon information and belief, Murillo went on to work for ServicePlus.

27.     Before departing, Murillo had zero reservations about going to work for ServicePlus. In fact, he outright told Mark Albert, Bestway's President, that ServicePlus was recruiting him specifically for his knowledge concerning Bestway's Proprietary Valve Technology and to help build ServicePlus' valve department; he also stated that ServicePlus offered him significantly more compensation in hourly wages, well-above market for his position. Murillo further told Albert that he was not worried about potential legal expenses should his work for ServicePlus lead to litigation. This is exactly the type of conduct Bestway had attempted to prevent in asking employees to sign agreements related to the Confidential Information, including the Employee Handbook.

28.     Just one week later, on or about June 21, 2024, Mapes contacted Mark Albert and Kyle Kenney, Vice President of Operations at Bestway, to inform him that he would be resigning. Mapes told Kenney that he would be going to work for

ServicePlus in Texas. According to his publicly-available LinkedIn profile, Mapes is currently a General Manager at ServicePlus.[5]

29.     Before his departure from Bestway, Mapes informed Albert that ServicePlus was recruiting him to develop a service-less valve for ServicePlus, just like Bestway's Proprietary Valve Technology, and to run their new valve department. When Albert reminded Mapes that the Proprietary Valve Technology was Bestway's protected proprietary information, Mapes responded that there were ways for him to "get away" with the use of this information. Mapes also brazenly told Albert that ServicePlus would cover his attorneys' fees if Bestway took legal action. Indeed, on May 21, 2024, Jacob Cox of ServicePlus texted Mapes: "if the lawyers from Bestway come after you we have lawyers that will take care of it for you… will pay the expenses."

30.     Before leaving, Mapes also spoke with Bestway's VP of Operations, Kyle Kenney. When Mapes told Kenney he was moving back to Texas, Kenney said Bestway would be happy to keep him and find him a position in Channelview. At that point, Mapes admitted he had already accepted a position with ServicePlus. Learning Mapes was going to work for a competitor, Kenney reminded Mapes that Bestway may have to take legal action to enforce his confidentiality and non-compete

---

[5] *See* https://www.linkedin.com/in/michael-mapes-12818abb/, last visited August 2, 2024.

obligations. Mapes responded with defiance, stating Bestway should not come after him because he "know[s] too much."

**G.** **Bestway Learns Mapes Stole Confidential Information Merely Days Prior to His Departure, and Murillo Took and Retained Highly Sensitive Photographs of Bestway's Proprietary Valve Technology.**

31.     During the course of its investigation leading up to this lawsuit, Bestway learned that Mapes had indeed already taken steps to improperly pilfer the company's confidential and proprietary business information to improperly compete with Bestway's business. Specifically, an examination of Mapes' work laptop reveals that in the last ten (10) days before his departure from Bestway, Mapes downloaded and exported confidential customer and vendor information from Bestway's ERP system into an Excel Spreadsheet entitled "Revenue by Group 6-10-24," which contains a list of most (if not all) of Bestway's Texas and Louisiana customers and vendors, all their contact information, and reflects specific parts ordered and price paid by each customer.

32.     As Bestway's Branch Manager in Pennsylvania, Mapes had no need whatsoever for accessing information regarding Bestway's Texas and Louisiana customers and vendors. It is therefore abundantly clear that Mapes only did so to steal Bestway's confidential information and share it with ServicePlus.

33.     The documents Mapes downloaded, especially documents downloaded from Bestway's ERP system, contain highly sensitive competitive information about

Bestway's business. ServicePlus or any other competitor could easily use these documents to identify easy targets of customers to steal from Bestway. Mapes must have shared this information with ServicePlus because Defendants' own text messages show ServicePlus has since then either sold valves or provided valve repair services to at least six of Bestway's customers.

34. For his part, Murillo not only took extensive photographs of Bestway's Proprietary Valve Technology on his personal cell phone, which he should not have done in the first place, but he also shared those photographs with Mapes and retained them on his cell phone long after leaving Bestway. Because the photographs include all component parts of the Proprietary Valve Technology and even show how those component parts fit together, experienced employees like Mapes and Murillo could easily use the photographs to construct similar or same valves for ServicePlus or any other competitor.

**H. Mapes and Murillo Use Bestway's Confidential Information to Help ServicePlus Improperly Develop a Competing Valve Department.**

35. Since joining ServicePlus, Mapes and Murillo have worked closely with Cox and other ServicePlus employees to use Bestway's Confidential Information to replicate its Proprietary Valve Technology and develop a competing valve department for ServicePlus. Text messages between Michael Mapes and Jacob Cox dated July 18, 2024, in which Cox references Bestway's Proprietary Valve

Technology, show Cox instructing Mapes: "Getting all these valves going is the number one thing we need to get our company growing."

36.     Among other things, Mapes and Murillo have, using their knowledge of Bestway's Confidential Information and patent-pending technology, advised ServicePlus regarding development of its own greaseless and service-less valves. Mapes has even specifically advised ServicePlus that it can buy the same type of valve paint Bestway uses from Bestway's vendor.

37.     Furthermore, since Mapes and Murillo joined ServicePlus, ServicePlus has either sold valves or provided valve repair services to at least six of Bestway's customers. Upon information and belief, Mapes and Murillo used Bestway's Confidential Information to either solicit business from these customers or otherwise sell them products and offer them services in violation of their written agreements with Bestway.

## V.     CAUSES OF ACTION

### COUNT I
### TRADE SECRET MISAPPROPRIATION UNDER DTSA
### (Against Mapes, Murillo, and ServicePlus)

38.     Bestway incorporates all preceding paragraphs as if fully set forth herein.

39.   Bestway operates its business and sells its products in interstate and foreign commerce, transacting and doing business with customers, vendors and others throughout the United States.

40.   Bestway conceives, designs and develops trade secrets, as that term is defined under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), as amended (the "DTSA").

41.   Among other things, Bestway's trade secrets include the technical specifications, drawings, design, research and know-how for its Proprietary Valve Technology. Bestway's trade secrets also include the company's Confidential Information, i.e., information relating to Bestway's operations; processes; products; customer lists; customer contact information; sales order histories; vendor lists; vendor contact information; purchase order histories; policies; strategies; training manuals; research; development; know-how; technical data; designs; drawings; illustrations; models; prototypes; developmental or experimental work; plans for research or future products, projects or services; management methods and information; reports, recommendations and conclusions.

42.   Bestway owns the above trade secrets.

43.   Bestway derives actual and potential economic value from its trade secrets not being generally known or readily ascertainable through proper means by

another person or entity who could obtain economic value from the disclosure or use of the information.

44.    Bestway derives economic value from its trade secrets through devoting substantial resources, time, and investment to creating, developing and using such information.

45.    As detailed in the foregoing allegations, Bestway has taken reasonable measures and precautions to safeguard its trade secrets and to limit and restrict others outside of Bestway from knowing, readily ascertaining or using its trade secrets. Among other things, Bestway protects its trade secrets by requiring its employees to have individual passwords to access the Confidential Information, which is maintained in a password-protected ERP system. Bestway further protects its information by requiring employees to agree to confidentiality and non-disclosure clauses as a condition of their employment with Bestway.

46.    Bestway's former employee Mapes willfully and maliciously misappropriated Bestway's trade secrets by using and/or disclosing the trade secrets without Bestway's consent to Bestway's direct competitor and Mapes's new employer—ServicePlus. Among other things, Mapes downloaded confidential customer and vendor information from Bestway's ERP system, Basis, just days before leaving Bestway, and upon information and belief, shared the Confidential Information with ServicePlus because ServicePlus has since either sold valves or

provided valve repair services to at least six of Bestway's customers. Since joining ServicePlus, Mapes and Murillo have worked with other employees at ServicePlus to use Bestway's trade secrets to reverse engineer and develop greaseless and serviceless valves similar to Bestway's for purposes of establishing a new valve department within ServicePlus that will then improperly compete with Bestway. Mapes has even specifically advised ServicePlus to buy the same type of valve paint that Bestway uses and to buy it from Bestway's vendor.

47.     Bestway's former employee Murillo has also willfully and maliciously misappropriated Bestway's trade secrets by using and/or disclosing the trade secrets, including extensive photographs he took of Bestway's Proprietary Valve Technology, without Bestway's consent to Bestway's direct competitor and Murillo's new employer—ServicePlus. Murillo has worked closely with Mapes, Cox other ServicePlus employees to use Bestway's Confidential Information to help ServicePlus develop a competing valve department. Among other things, Murillo has used Bestway's trade secrets to help ServicePlus troubleshoot and develop its own greaseless and serviceless valves to improperly compete with Bestway.

48.     ServicePlus also willfully and maliciously misappropriated Bestway's trade secrets by acquiring them from Mapes and Murillo with knowledge or reason to know that the trade secrets were acquired by improper means, including through inducement of a breach of Mapes's and Murillo's duties to maintain secrecy of

Bestway's trade secrets. ServicePlus has worked with Mapes and Murillo to improperly obtain and use Bestway's trade secrets to reverse engineer and develop valves similar to Bestway's for purposes of establishing a new valve department within ServicePlus that will then improperly compete with Bestway.

49.    Together, Mapes, Murillo and ServicePlus have also used Bestway's Confidential Information to either sell frac valves or provide valve repair services to at least six of Bestway's customers.

50.    As a direct and proximate result of Mapes's, Murillo's, and ServicePlus's breaches, Bestway has suffered and will continue to suffer injuries, including but not limited to actual damages, direct damages, indirect damages, incidental damages, consequential damages, special damages, lost profits, costs of mitigation, and irreparable damage to Bestway's goodwill, business reputation, confidential information, trade secrets, customer relationships and employment relationships. Bestway also seeks to recover its attorney's fees, costs and expenses.

51.    Moreover, because Mapes's, Murillo's, and ServicePlus's misappropriation was done willfully and maliciously, Bestway also seeks to recover exemplary damages.

52.    Mapes's, Murillo's, and ServicePlus's breaches have caused and will continue to cause Bestway irreparable harm that is not adequately remedied at law and that requires preliminary and permanent injunctive relief.

## COUNT II

### TRADE SECRET MISAPPROPRIATION UNDER TUTSA
### (Against Mapes, Murillo, and ServicePlus)

53.    Bestway incorporates all preceding paragraphs as if fully set forth herein.

54.    Bestway is an oilfield services company that sells, rents, repairs, and services specialized oilfield equipment. Bestway's trade secrets include the technical specifications, drawings, design, research and know-how for its Proprietary Valve Technology. Bestway's trade secrets also include Confidential Information, i.e., information relating to Bestway's operations; processes; products; customer lists; customer contact information; vendor lists; policies; strategies; training manuals; research; development; know-how; technical data; designs; drawings; illustrations; models; prototypes; developmental or experimental work; plans for research or future products, projects or services; management methods and information; reports, recommendations and conclusions. Bestway's Confidential Information are trade secrets because: (1) Bestway made a reasonable effort to keep this information secret in that it made employees who had access to Confidential Information, such as Mapes and Murillo, sign agreements to protect Bestway's Confidential Information, and (2) the Confidential Information derives independent economic value from not being generally known to or readily ascertainable through

proper means by third parties. This is acknowledged in the Employment Agreement, Article IV(A)(i).

55. Bestway's former employee Mapes willfully and maliciously misappropriated Bestway's trade secrets by using and/or disclosing the trade secrets without Bestway's consent to Bestway's direct competitor and Mapes's new employer—ServicePlus. Among other things, Mapes downloaded confidential customer and vendor information from Bestway's ERP system, Basis, just days before leaving Bestway, and upon information and belief, shared the Confidential Information with ServicePlus because ServicePlus has since either sold valves or provided valve repair services to at least six of Bestway's customers. Since joining ServicePlus, Mapes and Murillo have worked with other employees at ServicePlus to use Bestway's trade secrets to reverse engineer and develop greaseless and serviceless valves similar to Bestway's for purposes of establishing a new valve department within ServicePlus that will then improperly compete with Bestway. Mapes has even specifically advised ServicePlus to buy the same type of valve paint that Bestway uses and to buy it from Bestway's vendor.

56. Bestway's former employee Murillo has also willfully and maliciously misappropriated Bestway's trade secrets by using and/or disclosing the trade secrets, including extensive photographs he took of Bestway's Proprietary Valve Technology, without Bestway's consent to Bestway's direct competitor and

Murillo's new employer—ServicePlus. Murillo has worked closely with Mapes, Cox other ServicePlus employees to use Bestway's Confidential Information to help ServicePlus develop a competing valve department. Among other things, Murillo has used Bestway's trade secrets to help ServicePlus troubleshoot and develop its own greaseless and service-less valves to improperly compete with Bestway.

57.    ServicePlus also willfully and maliciously misappropriated Bestway's trade secrets by acquiring them from Mapes and Murillo with knowledge or reason to know that the trade secrets were acquired by improper means, including through inducement of a breach of Mapes's and Murillo's duties to maintain secrecy of Bestway's trade secrets. ServicePlus has worked with Mapes and Murillo to improperly obtain and use Bestway's trade secrets to reverse engineer and develop valves similar to Bestway's for purposes of establishing a new valve department within ServicePlus that will then improperly compete with Bestway.

58.    Together, Mapes, Murillo and ServicePlus have also used Bestway's Confidential Information to either sell frac valves or provide valve repair services to at least six of Bestway's customers.

59.    As a direct and proximate result of Mapes's, Murillo's, and ServicePlus's breaches, Bestway has suffered and will continue to suffer injuries, including but not limited to actual damages, direct damages, indirect damages, incidental damages, consequential damages, special damages, lost profits, costs of

mitigation, and irreparable damage to Bestway's goodwill, business reputation, confidential information, trade secrets, customer relationships and employment relationships. Bestway also seeks to recover its attorney's fees, costs and expenses.

60.    Moreover, because Mapes's, Murillo's, and ServicePlus's misappropriation was done willfully and maliciously, Bestway also seeks to recover exemplary damages.

61.    Mapes's, Murillo's, and ServicePlus's breaches have caused and will continue to cause Bestway irreparable harm that is not adequately remedied at law and that requires preliminary and permanent injunctive relief.

## COUNT III
## COMMON LAW MISSAPROPRIATION/UNFAIR COMPETITION
### (Against Mapes, Murillo, and ServicePlus)

62.    Bestway incorporates all preceding paragraphs as if fully set forth herein.

63.    Alternatively, if Bestway cannot recover under Count II, Bestway asserts a claim for common law misappropriation / unfair competition against Defendants.

64.    The creation of the Proprietary Valve Technology, which is trade secret information, was the product of extensive time, labor, skill and money by Bestway.

65.    On information and belief, Mapes and Murillo have used their knowledge concerning the Proprietary Valve Technology with Bestway's competitor

and their new employer, ServicePlus, thereby allowing themselves and ServicePlus to gain an advantage over Bestway because Mapes, Murillo, and ServicePlus were not burdened with the time and expense incurred by Bestway in developing the Proprietary Valve Technology.

66.    As a direct and proximate result of Mapes's, Murillo's, and ServicePlus's breaches, Bestway has suffered and will continue to suffer injuries, including but not limited to actual damages, direct damages, indirect damages, incidental damages, consequential damages, special damages, lost profits, costs of mitigation, and irreparable damage to Bestway's goodwill, business reputation, confidential information, trade secrets, customer relationships and employment relationships. Bestway also seeks to recover its attorney's fees, costs and expenses.

67.    Moreover, because Mapes's, Murillo's, and ServicePlus's misappropriation was done willfully and maliciously, Bestway also seeks to recover exemplary damages.

68.    Mapes's, Murillo's, and ServicePlus's breaches have caused and will continue to cause Bestway irreparable harm that is not adequately remedied at law and that requires preliminary and permanent injunctive relief.

## COUNT IV
## BREACH OF CONTRACT
### (Against Mapes and Murillo)

69.    Bestway incorporates all preceding paragraphs as if fully set forth herein.

70.    As a condition of his employment with Bestway, Mapes executed the Employment Agreement, which is a valid and enforceable written agreement, supported by valid and mutual consideration.

71.    Bestway fully performed all its obligations under the Employment Agreement.

72.    Upon information and belief, Mapes breached the Employment Agreement in at least the following ways:

    a) Using and disclosing Bestway's Confidential Information to benefit himself and his new employer, ServicePlus, in violation of Article IV(A)(i) of the Employment Agreement;

    b) Becoming employed with ServicePlus, Bestway's direct competitor, in Houston, Texas within two years following his employment with Bestway in direct violation of the non-competition clause found in Article IV(B)(i) of the Employment Agreement; and

    c) Using Bestway's Confidential Information to attempt to solicit business with or interfere with Bestway's business within two years following his employment with Bestway in direct violation of Article IV(B)(ii) of the Employment Agreement; and

    d) Using Bestway's Confidential Information to solicit, recruit or encourage other Bestway employees to leave their employment with Bestway in direct violation of Article IV(B)(iii) of the Employment Agreement.

73.   With respect to Mapes' breach of the non-competition clause found in Article IV(B)(i) of the Employment Agreement, the clause is reasonable as a matter of law as to time, scope of proscribed conduct, and geographical area:

> (i)   **Non-Competition**.  Employee agrees that during the Restricted Period (defined below), other than in connection with Employee's duties under this Agreement, Employee shall not, without the prior written consent of the Company, directly or indirectly, either individually or as a principal, partner, stockholder, manager, agent, consultant, contractor, distributor, employee, lender, investor, or as a director or officer of any corporation or association, or in any other manner or capacity whatsoever, (a) control, manage, operate, establish, take steps to establish, lend money to, invest in, solicit investors for, or otherwise provide capital to, or (b) become employed by, join, perform services for, consult for, do business with or otherwise engage in any Competing Business (defined below) within the Restricted Area (defined below).  Employee shall not receive any additional compensation for the enforceability of the Restrictive Covenants in this Article IV.
>
> For purposes of this Agreement:
>
> (a)   "***Restricted Period***" means during Employee's employment with the Company and for a period of twenty-four (24) months immediately following the date of Employee's termination from employment for any reason or if Employee leaves Company for any reason.
>
> (b)   As Branch Manager, Employee has overall responsibility for the Company's business in the United States of America, and has access to the Company's Confidential Information.  Therefore, the "***Restricted Area***" means within 250 miles of any geographic area in which Company operates or sells to or will operate or sell to in the future, including, its locations in Channelview, Texas, Alice, Texas, Tyler, Texas, Odessa, Texas, and Burgettstown, Pennsylvania, or seriously considered opening a location, during Employee's employment and for which Employee had any responsibility or about which Employee received Confidential Information.
>
> (c)   "***Competing Business***" means any business, individual, partnership, firm, corporation or other entity that is engaged in the sale, service, rental or repairs of oilfield equipment and any other business the Company conducted and for which Employee had any responsibility or took steps to conduct during Employee's employment with the Company and about which Employee received Confidential Information.

Employment Agreement, Article IV(B)(i).

74. *First*, the non-compete is reasonably limited in time, specifically defining "Restricted Period" to be limited to a period of twenty-four (24) months or two (2) years immediately following the date of termination. Texas state and federal courts repeatedly find 2-years-long covenants not to compete are reasonable. *See e.g., Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553 (S.D. Tex. 2014) ("two-year duration of the covenant not to compete is reasonable"); *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 857 (W.D. Tex. 2016) (two-year limit is reasonable).

75. *Second,* the non-compete is reasonably limited in geographic scope because it is commensurate with the territories in which Mapes worked for Bestway (including in Channelview, Texas), Bestway has a national customer base, and Mapes was a management-level employee entrusted with servicing those customers and with access to sensitive, proprietary information (as Branch Manager, Mapes was entrusted with access to customers, vendors, sales and purchase order information, technical drawings for proprietary technology, and readily participated in weekly Manager meetings and quarterly sales meetings, at which the needs of all of Bestway's customers were discussed). Such conditions render his agreement not-to-compete within the "Restricted Area", which is specifically defined as "within 250 miles of any geographic area in which [Bestway] operates or sells… including in Channelview, Texas," reasonable. *See e.g.*, *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 567-68 (S.D. Tex. 2014) (non-compete likely enforceable even though

its geographic scope included the United States and any country in which the employer did business because departing employee was a Regional Sales Manager with extensive access to and knowledge of the employer's trade secrets, sensitive pricing information and authority to meet with customers to develop the company's goodwill and sales); *AmeriPath, Inc. v. Hebert,* 447 S.W.3d 319 (Tex. App.—Dallas 2014, pet. denied) (even a nation-wide reach in a noncompete is not overly broad where employee is part of the employer's highest-level management team); *M-I LLC v. Stelly,* 733 F. Supp. 2d 759, 798 (S.D. Tex. 2010) ("given [the departing employee's] extensive job responsibilities, his position in upper management… and the fact that his actual territory did span the Americas, the geographic restriction contained in the covenant was reasonable to protect [the employer's business interests").

76.     *Third,* the non-compete is also not an industry-wide exclusion but is rather reasonable with respect to the scope of proscribed activity because "Competing Business" is specifically defined to mean "any business, individual, partnership, firm, corporation or other entity that is engaged in the sale, service, rental or repairs of oilfield equipment and any other business [Bestway] conducted ***and*** for which [Mapes] had any responsibility or took steps to conduct during [his] employment with [Bestway] ***and*** about which [Mapes] received Confidential Information." Employment Agreement, Article IV(B)(i)(c) (emphasis added). The word "and" is a

conjunction in the English language that is used to connect two nouns, adjectives or phrases together. The definition of "Competing Business" must therefore be given its conjunctive reading. By its very terms, the noncompete only prevents Mapes from working for competitors who are in the same line of business as Bestway (the sale, service, rental or repairs of oilfield equipment) ***and*** in the same capacity in which he worked for Bestway (for which Mapes had any responsibility ***and*** about which he received Confidential Information). In other words, Mapes is free to work for any one of the thousands of other businesses in the oil and gas industry who are not engaged in the sale, service rental or repairs of oilfield equipment), *and he is even free to work for companies who are in the same line of business so long as he does not work for them in the same capacity in which he worked for Bestway.*

77.     Such restrictions are reasonable as a matter of law. *See M–I LLC v. Stelly,* 733 F.Supp.2d 759, 794-95 (S.D. Tex. 2010) (upholding as reasonable a noncompete that did not bar the employee from working in the oil and gas industry altogether, but only in the oil displacement tools or services industry); *Salas v. Chris Christensen Systems, Inc*., 2011 WL 4089999, at *20 (Tex. App.—Waco Sept. 14, 2011, no pet.) (mem. op.) (noncompete that applied to the "pet supply manufacturing and distribution industry" did not apply to "the entire industry pertaining to pets or pet products" and was therefore not unreasonably broad in scope of activity; *Merritt Hawkins & Assocs., LLC v. Gresham*, 79 F.Supp.3d 625, 641 (N.D. Tex. 2015) (non-

compete prohibiting an employee from working in permanent and temporary medical staffing was not an industry-wide exclusion, where it did not prohibit the employee from working in "other sections of the staffing industry or the medical industry").

78.     Additionally, as a condition of Mapes's and Murillo's employment with Bestway, Mapes and Murillo executed an Acknowledgement of Receipt of Employee Handbook in which they agreed to comply with the policies, procedures, and other guidelines set forth in the Employee Handbook. The Employee Handbook is a valid and enforceable written agreement, supported by valid and mutual consideration.

79.     Bestway fully performed all its obligations under the Employee Handbook.

80.     Upon information and belief, Mapes and Murillo breached the Employee Handbook by disclosing Bestway's confidential and proprietary trade secret information to ServicePlus.

81.     As a direct and proximate result of Mapes's and Murillo's breaches, Bestway has suffered and will continue to suffer injuries, including but not limited to actual damages, direct damages, indirect damages, incidental damages, consequential damages, special damages, lost profits, costs of mitigation, and irreparable damage to Bestway's goodwill, business reputation, confidential information, trade secrets, customer relationships and employment relationships.

82. Mapes's and Murillo's breaches have caused and will continue to cause Bestway irreparable harm that is not adequately remedied at law and that requires preliminary and permanent injunctive relief.

## COUNT V
## BREACH OF FIDUCIARY DUTY
### (Against Mapes and Murillo)

83. Bestway incorporates all preceding paragraphs as if fully set forth herein.

84. As Bestway's Branch Manager with nearly nine years of trust and confidence placed in him, Mapes owed Bestway fiduciary and other duties, including duties of care, loyalty, good faith, and candor.

85. As a Valve Technician Instructor at Bestway with nearly nine years of trust and confidence placed in him, Murillo owed Bestway fiduciary and other duties, including duties of care, loyalty, good faith, and candor.

86. Mapes and Murillo breached their fiduciary duties to Bestway by acting for their own interests in going to work for a competitor, ServicePlus. And Mapes and Murillo further breached their fiduciary duties by helping their new employer develop a frac valve department to improperly compete with Bestway and helping their new employer lure away Bestway's customers, vendors and other employees.

87. Mapes's and Murillo's breaches enabled ServicePlus to unfairly compete with Bestway's business and market opportunities. As a direct and

proximate result, Bestway has suffered and will continue to suffer injuries, including but not limited to actual damages, direct damages, indirect damages, incidental damages, consequential damages, special damages, lost profits, costs of mitigation, and irreparable damage to Bestway's goodwill, business reputation, customer relationships and employment relationships.

88.     Mapes's and Murillo's breaches have caused and will continue to cause Bestway irreparable harm that is not adequately remedied at law and that requires preliminary and permanent injunctive relief.

## <u>COUNT VI</u>
## CIVIL CONSPIRACY
### (Against Mapes, Murillo, and ServicePlus)

89.     Bestway incorporates all preceding paragraphs as if fully set forth herein.

90.     Mapes, Murillo, and ServicePlus were members of a combination of two or more persons, whose agreed specific intent was to tortiously interfering with Mapes' and Murillo's fiduciary duties, obligations, and agreements with Bestway, so Mapes and Murillo could help ServicePlus improperly compete with Bestway's business. They did so with the intent to harm Bestway.

91.     Mapes, Murillo, and ServicePlus had knowledge of, and each agreed to take steps to accomplish the object of their agreed purpose. For its part, ServicePlus,

acting by and through its President Jacob Cox, promised to pay Mapes and Murillo more money than Bestway paid them, offered to pay Mapes tens of thousands of dollars in moving fees, and encouraged both men not to worry about the legal consequences of their actions by promising, "if the lawyers from Bestway come after you we have lawyers that will take care of it for you…we will pay the expenses." And in fact Cox admits he is now paying Mapes' and Murillo's legal expenses.

92.    For their part, Mapes and Murillo willingly agreed to work with ServicePlus, whom they knew to be Bestway's direct competitor, and to share with ServicePlus Bestway's Confidential Information to achieve this improper objective. On June 22, 2024, Murillo encouraged Mapes to join ServicePlus by writing "we need you here buddy." And when Mapes agreed to join Cox and Murillo, he brazenly joked, "Can we put a now hiring billboard in front of Bestway lol," to which Jacob Cox responded, "I would love that," thereby acknowledging that a significant part of their joint objective had been accomplished.

93.    To accomplish the object of their agreement, Mapes and Murillo breached their contractual and fiduciary duties to Bestway for their own and ServicePlus's benefit.

94.    Bestway suffered injury as a proximate result of these unlawful, overt acts. As a result, Bestway seeks all damages, including exemplary damages, to which it is entitled.

## COUNT VII

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (Against ServicePlus)

95.     Bestway incorporates all preceding paragraphs as if fully set forth herein.

96.     As shown above, Mapes and Murillo both owed fiduciary duties to Bestway. ServicePlus knew Mapes and Murillo would be breaching those fiduciary duties to Bestway by going to work for a competitor and by helping their new employer to develop a competing frac valve department and to lure away Bestway's customers, vendors and other employees

97.     With the intent to assist Mapes and Murillo in committing the tort, ServicePlus substantially assisted and encouraged Mapes and Murillo by encouraging them to resign from Bestway and soliciting them to work for ServicePlus. ServicePlus even promised to pay their legal fees in the event Bestway took legal action against Mapes and Murillo. Indeed, ServicePlus's President, Jacob Cox, reassured the departing employees they had nothing to worry about in breaching their duties, stating "if the lawyers from Bestway come after you we have lawyers that will take care of it for you…we will pay the expenses." To lure the employees over, ServicePlus also deliberately offered to pay Mapes and Murillo more than Bestway was paying them.

98.     ServicePlus's assistance and encouragement was a substantial factor in causing Mapes and Murillo to breach their fiduciary duties to Bestway.

99.     As a direct and proximate result, Bestway has suffered and will continue to suffer injuries, including but not limited to actual damages, direct damages, indirect damages, incidental damages, consequential damages, special damages, lost profits, costs of mitigation, and irreparable damage to Bestway's goodwill, business reputation, customer relationships and employment relationships.

## COUNT VIII
### TORTIOUS INTERFERENCE WITH CONTRACT
### (Against ServicePlus)

100.    Bestway incorporates all preceding paragraphs as if fully set forth herein.

101.    Bestway had a valid and enforceable Employment Agreement with Mapes.

102.    ServicePlus knew or had reason to know of Bestway's Employment Agreement with Mapes, as Cox, the owner of ServicePlus, is a former Bestway employee who is himself familiar with Bestway's employment practices and encouraged Mapes not to worry about the legal consequences of breaching the Agreement.

103.    ServicePlus willfully and intentionally interfered with Bestway's Employment Agreement with Mapes by hiring him away to work for a competitor

within the time and geographical limits covered by his non-compete with Bestway. ServicePlus encouraged Mapes to breach the non-compete by stating, "if the lawyers from Bestway come after you we have lawyers that will take care of it for you…we will pay the expenses."

104. As a direct and proximate result of ServicePlus's tortious interference, Bestway has suffered and will continue to suffer injuries, including but not limited to actual damages, direct damages, indirect damages, incidental damages, consequential damages, special damages, lost profits, costs of mitigation, and irreparable damage to Bestway's goodwill, business reputation, customer relationships and employment relationships.

105. Moreover, because ServicePlus's tortious interference was done willfully and maliciously, Bestway also seeks to recover exemplary damages.

106. ServicePlus's tortious interference has caused and will continue to cause Bestway irreparable harm that is not adequately remedied at law and that requires preliminary and permanent injunctive relief.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Bestway prays for preliminary injunctive relief and that upon final hearing or trial, Bestway be awarded the following:

    a.  Judgment against Defendants for a sum within the jurisdictional limits of this Court;

b. Permanent injunctive relief;

c. Attorney's fees;

d. Pre- and post-judgment interest as provided by law; and

e. All other relief to which Bestway may be entitled in equity or law.

Respectfully submitted,

*/s/ Ardalan Attar*

Ardalan Attar
S. D. TX ID No. 3471428
State Bar No. 24113538
*aattar@christianattarlaw.com*
**CHRISTIANATTAR**
1177 W Loop S, Ste 1700
Houston, Texas 77027
(713) 659-7617 telephone
(713) 659-7614 facsimile

Justin W. R. Renshaw
S.D. TX Adm. ID No. 25865
Texas Bar No. 24013392
*justin@renshaw-law.com*
**RENSHAW PC**
2900 Weslayan, Suite 360
Houston, Texas 77027
Phone: 713.400.9001

Sanja Muranovic
S.D. TX ID No. 2167594
Texas Bar No. 24083540
*sanja.muranovic@muranoviclaw.com*
**MURANOVIC LAW PLLC**
One Riverway Dr. Suite 1700
PMB 5369

Houston, Texas 77056
Phone: 512.666.0261

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on this October 4, 2024.

*/s/ Ardalan Attar*
Ardalan Attar